UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CHG-MERIDIAN USA CORPORATION,<br><br>        Plaintiff/Counter-defendant,<br><br>v.<br><br>MARCUS THEATRES CORPORATION,<br><br>        Defendant/Counter-plaintiff. | Case No.: 24-CV-26-JPS |

**PLAINTIFF CHG-MERIDIAN USA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANT MARCUS THEATRES CORPORATION'S COUNTERCLAIMS**

Plaintiff CHG-Meridian USA Corporation ("CHG"), by and through their attorneys, Quarles & Brady LLP, responds to the Counterclaims of Defendant and Counter-plaintiff, Marcus Theatres Corporation ("Marcus"), as follows:

### FACTUAL ALLEGATIONS

1. When the movie industry went digital over a decade ago, movie studios agreed to provide financing to theatre operators and partially fund the acquisition of expensive digital projection equipment.

**ANSWER:** CHG lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and therefore denies them.

2. This financing was accomplished through the payment of "Virtual Print Fees" ("VPFs") by the movie studios to theatre operators.

**ANSWER:** CHG lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and therefore denies them.

1

3. Specifically, when movie theatres exhibited certain eligible digital movies, they were paid VPFs by movie studios ("Distributors").

**ANSWER: CHG lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and therefore denies them.**

4. Here, the financing and funding arrangement for digital projection equipment was accomplished through a Master Lease Agreement and Master License Agreement, both facilitated by CHG.

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 Holdings, LLC and Marcus Theatres Corporation dated July 5, 2011, the terms of which speak for themselves. CHG admits the existence of a Master Equipment Lease between CHG-Meridian U.S. Finance, Ltd., and CDF2 Holdings, LLC dated October 18, 2011, the terms of which speak for themselves. Paragraph 4 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 4.**

5. Marcus is not a party to the Master Lease Agreement, under which CHG leased digital projection equipment to CDF2 Holdings, LLC.

**ANSWER: CHG admits the existence of a Master Equipment Lease between CHG-Meridian U.S. Finance, Ltd., and CDF2 Holdings, LLC dated October 18, 2011, the terms of which speak for themselves. CHG affirmatively alleges that Marcus expressly acknowledged the existence and terms of the Master Equipment Lease in a Lease Acknowledgement Agreement in which Marcus acknowledged that its "use of the Equipment under the terms and conditions of the MLA is subject and subordinate in all respects to the terms and conditions of the Lease Agreement . . . ." Paragraph 5 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 5.**

6. In July 2011, Marcus and CDF2 entered into the Master License Agreement ("License Agreement"), pursuant to which Marcus licensed certain digital cinema projection equipment ("Equipment").

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 Holdings, LLC ("CDF2") and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 6 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 6.**

*Marcus's Booking Commitment*

7. In exchange for a license to use the Equipment, Marcus agreed to a "Booking Commitment," which is defined in the License Agreement to include all of the following components:

   a. Marcus agrees to book "Eligible Digital Titles," as defined in the License, which generates payment of VPFs by Distributors to CDF2.

   b. Marcus agrees to pay "Relocation Expenses" directly to CDF2 in an amount set forth in the License.

   c. The sum of the VPFs paid by Distributors to CDF2 and the Relocation Expenses paid by Marcus to CDF2 equals or exceeds $9600 per screen per rolling four quarter period (the "Test Period").

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 7 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 7.**

8. Under the License Agreement, the Booking Commitment remained in effect until all debt, lease financing or other financing of the Equipment was paid off (the "Payoff Date").

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 8 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 8.**

*Distributor's Payment of Virtual Print Fees*

9. CDF2 had its own contracts with movie studios pursuant to which the studios agreed to pay VPFs to CDF2. These contracts are referred to as "Distributor Agreements" in the License Agreement.

**ANSWER: CHG lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding CDF2's contracts and therefore denies them. CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 9 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 9.**

10. The Distributor Agreements provided for payment of "Standard Virtual Print Fees," in the amounts set forth in Exhibit O to the License Agreement.

**ANSWER: CHG lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Distributor Agreements and therefore denies them. CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 10 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 10.**

11. CDF2 represented in the License Agreement that the terms of the Distributor Agreements would not provide for a discount to the Standard Virtual Print Fees until the Payoff Date.

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 11 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 11.**

12. The Payoff Date under the License was March 31, 2022.

**ANSWER: CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 12 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 12.**

13. On or around September 2020, CHG informed Marcus of "pandemic discounts" being applied to certain VPFs.

**ANSWER: CHG admits that in September of 2020 it informed Marcus of CHG's knowledge of certain agreements with Distributors concerning the obligations of the parties during the pandemic. CHG denies all remaining allegations in Paragraph 13.**

14. By discounting VPFs prior to the Payoff Date, CHG/CDF2 breached the License Agreement.

**ANSWER: Paragraph 14 contains legal conclusions to which no response is required. CHG denies the allegations in Paragraph 14.**

15. CHG/CDF2's breach damaged Marcus by reducing the sum of VPFs and Relocation Expenses paid to CDF2 per Test Period.

**ANSWER:** CHG denies the allegations in Paragraph 15.

### *Marcus's Right to Purchase the Equipment*

16. At the end of the term of the License Agreement Marcus had the option to purchase the Equipment provided it gave CDF2 written notice of its intent to purchase and the parties agreed on a purchase price (the "Purchase Option").

**ANSWER:** **CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 16 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 16.**

17. If Marcus did not exercise the Purchase Option, CDF2 had a right to repossess the Equipment.

**ANSWER:** **CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 17 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 17.**

18. If CDF2 failed to remove the Equipment within 60 days after expiration or termination of the License Agreement, the License Agreement confirms the "Equipment will be deemed abandoned by CDF2."

**ANSWER:** **CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 18 contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 18.**

19. Marcus provided CDF2 notice of its intent to purchase the equipment.

**ANSWER**: **CHG denies the allegations in Paragraph 19.**

20. Marcus and CHG exchanged several appraisal reports estimating the value of the Equipment.

**ANSWER: CHG lacks knowledge and information sufficient to answer as to the specific appraisals referenced; to the extent an answer is required, CHG admits to the extent that certain appraisals were exchanged; CHG denies all remaining allegations**.

21. On June 29, 2022, CHG provided Marcus with a notice of termination of the Master Lease Agreement between CHG and CDF2.

**ANSWER: CHG admits that it sent a "Notice of Lease Termination" to Cinedigm Corp., CDF2, and Marcus on June 29, 2022, the terms of which speak for themselves. CHG denies any remaining allegations in Paragraph 21.**

22. In the June 29, 2022 notice, CHG offered to sell the Equipment to Marcus for $7,645,778.

**ANSWER: CHG admits that it sent a "Notice of Lease Termination" to Cinedigm Corp., CDF2, and Marcus on June 29, 2022, the terms of which speak for themselves. CHG denies any remaining allegations in Paragraph 22.**

23. Following the June 2022 notice, and pursuant to its prior notice of intent to purchase the Equipment, Marcus countered CHG's offer and offered to purchase the Equipment for $1,906,490.

**ANSWER: CHG denies the allegations in Paragraph 23.**

24. On August 25, 2022, counsel for CHG accepted Marcus's offer to purchase the Equipment for $1,906,490.

**ANSWER:** **CHG admits that its counsel sent a letter dated August 25, 2022 to Marcus and that the letter speaks for itself. CHG denies any remaining allegations in Paragraph 24.**

25. On September 14, 2022, counsel for CHG reiterated CHG's acceptance of Marcus's offer to purchase the Equipment for $1,906,490.

**ANSWER:** **CHG denies the allegations in Paragraph 25.**

26. On September 23, 2022, counsel for Marcus confirmed Marcus and CHG's agreement that Marcus would purchase the Equipment for $1,906,490 and directed CHG to prepare the necessary paperwork to transfer ownership.

**ANSWER:** **CHG admits that counsel for Marcus sent a letter dated September 23, 2022 to counsel for CHG and that the letter speaks for itself. CHG denies any remaining allegations in Paragraph 26.**

27. On or around October 2022, CHG breached its agreement with Marcus by refusing to sell the Equipment and demanding additional terms, including Marcus's payment of over $6 million in allegedly unpaid booking commitments.

**ANSWER:** **CHG denies the allegations in Paragraph 27.**

## COUNT I
### (Breach of the License Agreement)

28. Marcus realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

**ANSWER:** **CHG repeats and reincorporates its responses to all prior paragraphs of its Answer. CHG also incorporates the allegations in CHG's Complaint.**

29. The License Agreement is a valid and enforceable contract.

**ANSWER:** **CHG admits the existence of a Master License Agreement between CDF2 and Marcus dated July 5, 2011, the terms of which speak for themselves. Paragraph 29**

8

**contains legal conclusions to which no response is required. CHG denies all remaining allegations in Paragraph 29.**

30. CHG elected to assume the obligations of CDF2 under the License Agreement.

**ANSWER: Paragraph 30 contains a legal conclusion to which no response is required; the License agreement as well as other contracts, including but not limited to the Master Lease Agreement, speak for themselves; to the extent an answer is required, CHG admits that it has certain rights under the agreements; CHG denies all remaining allegations.**

31. Upon information and belief, CHG breached the License by agreeing to discounted VPFs prior to the Payoff Date.

**ANSWER: CHG denies the allegations in Paragraph 31.**

32. CHG's breach damaged Marcus by, among other things, reducing the sum of VPFs and Relocation Expenses paid to CDF2 per Test Period.

**ANSWER: CHG denies the allegations in Paragraph 32.**

33. As a result of CHG's breach, Marcus is entitled to damages in an amount to be determined at trial.

**ANSWER: CHG denies the allegations in Paragraph 33.**

### COUNT II
### (Breach of the Purchase Agreement)

34. Marcus realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

**ANSWER: CHG repeats and reincorporates its responses to all prior paragraphs of its Answer. CHG also incorporates the allegations in CHG's Complaint.**

35. Marcus's offer to purchase the Equipment for $1,906,490, and CHG's acceptance of that offer created a valid and enforceable contract (the "Purchase Agreement").

**ANSWER:** CHG denies the allegations in Paragraph 35.

36. CHG breached the Purchase Agreement by refusing to sell the Equipment to Marcus absent additional payment of sums by Marcus.

**ANSWER:** CHG denies the allegations in Paragraph 36.

37. All conditions precedent to the Purchase Agreement have occurred, been performed, or otherwise satisfied.

**ANSWER:** CHG denies the allegations in Paragraph 37.

38. CHG's breach damaged Marcus in an amount to be determined at trial.

**ANSWER:** CHG denies the allegations in Paragraph 38.

### COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

39. Marcus realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

**ANSWER:** CHG repeats and reincorporates its responses to all prior paragraphs of its Answer. CHG also incorporates the allegations in CHG's Complaint.

40. The Purchase Agreement between Marcus and CHG for the sale of the Equipment gave rise to an implied covenant of good faith and fair dealing that was binding on the parties.

**ANSWER:** Paragraph 40 contains legal conclusions to which no response is required; to the extent an answer is required, CHG denies the allegations in Paragraph 40.

41. CHG evaded the spirit of the bargain, rendered the transaction unfair, and breached the implied covenant of good faith and fair dealing by repudiating the agreement and refusing to sell the Equipment to Marcus.

**ANSWER:** CHG denies the allegations in Paragraph 41.

42. CHG's breach of the implied covenant of good faith and fair dealing damaged Marcus in an amount to be determined at trial.

**ANSWER: CHG denies the allegations in Paragraph 42.**

## COUNT IV
### (Declaratory Judgment – 28 U.S.C. § 2201)

43. Marcus realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

**ANSWER: CHG repeats and reincorporates its responses to all prior paragraphs of its Answer. CHG also incorporates the allegations in CHG's Complaint.**

44. Pursuant to 28 U.S.C. § 2201, Marcus seeks a declaration from the Court as to the validity of the Purchase Agreement with CHG, or in the alternative, a declaration that CHG abandoned the Equipment under the License by failing to remove it within 60 days after termination of the License.

**ANSWER: Paragraph 44 contains legal conclusions to which no response is required; to the extent an answer is required, CHG denies the allegations in Paragraph 44.**

45. All conditions precedent have occurred or been performed by Marcus, or otherwise satisfied.

**ANSWER: CHG denies the allegations in Paragraph 45.**

46. A legal controversy exists between Marcus and CHG over the validity of the Purchase Agreement, or in the alternative, whether the Equipment has been abandoned.

**ANSWER: CHG denies the allegations in Paragraph 46.**

47. This legal controversy is ripe for adjudication.

**ANSWER: CHG denies the allegations in Paragraph 47.**

48. A determination as to whether or not the Purchase Agreement is enforceable, or whether or not the Equipment was abandoned, will terminate the controversy between the parties.

**ANSWER:** CHG denies the allegations in Paragraph 48.

49. Under Wisconsin law and 28 U.S.C. § 2201, Marcus is entitled to a declaration that the Purchase Agreement is valid and enforceable, or in the alternative, that CHG abandoned the Equipment.

**ANSWER:** CHG denies the allegations in Paragraph 49.

## CHG'S AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would otherwise bear, CHG asserts the following separate and additional defenses, all of which are pleaded in the alternative, and none of which constitute an admission that CHG is in any way liable to Marcus, that Marcus has been or will be injured or damaged in any way, or that Marcus is entitled to any relief whatsoever. CHG reserves the right to amend or supplement its affirmative defenses and raise counterclaims as additional facts concerning its defenses become known to CHG. As a defense to Marcus' Counterclaims and each and every allegation contained therein, CHG alleges the following affirmative defenses:

1. Marcus has failed to state a claim upon which relief can be granted.

2. Marcus' claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

3. Marcus' claims are barred, in whole or in part, because Marcus has not sustained injury or damage as a result of CHG's alleged actions.

4. Marcus' claims are barred, in whole or in part, because of failure of condition(s) precedent.

5. Marcus' claims are barred, in whole or in part, because of indefinite terms.

6. Marcus' claims are barred, in whole or in part, for lack of consideration.

7. Marcus' claims are barred, in whole or in part, for lack of mutual assent and/or lack of meeting of the minds.

8. Marcus' claims are barred, in whole or in part, for unilateral mistake of fact.

9. Marcus' claims are barred, in whole or in part, by Marcus' prior breach of contract.

10. Marcus' claims are barred, in whole or in part, by the lack of notice of a breach of contract.

11. Marcus' claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, acquiescence, and/or laches.

12. Marcus' claims are barred, in whole or in part, by Marcus' assent.

13. Marcus' claims are barred, in whole or in part, by the doctrine of modification and/or ratification.

14. Marcus' damages are barred, in whole or in part, because of its failure to mitigate damages, if any.

15. Marcus' claims are barred, in whole or in part, to avoid the unjust enrichment of Marcus.

16. Marcus' claims are barred, in whole or in part, by the applicable statutes of limitations.

17. Marcus' claims are barred, in whole or in part, because if Marcus was damaged in any way, the damage or injury was due to Marcus' own conduct.

18. Marcus' claims are barred, in whole or in part, because CHG has complied with each of its contractual obligations.

19. Marcus' claims are barred, in whole or in part, for lack of damages.

20. Marcus fails to name all necessary parties.

21. Marcus' claims are barred, in whole or in part, by its own conduct, including but not limited to its failure to comply with its own contractual obligations and conditions and its own violation of the implied covenant of good faith and fair dealing.

**WHEREFORE**, CHG respectfully requests an order from this Court:

A. Granting the relief as previously and further set forth in CHG's Amended Complaint;

B. Dismissing the Defendants' Counterclaims with prejudice;

C. For all other relief as the Court may deem fair and equitable.

Dated this 22nd day of May, 2024.

QUARLES & BRADY LLP

*/s/ Brittany S. Ogden*
Brittany S. Ogden
State Bar No. 1035853
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166
Email: Brittany.Ogden@quarles.com

Nathan J. Oesch
State Bar No. 1101380
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202-4497
Telephone: (414) 277-5120
Email: Nathan.Oesch@quarles.com

*Attorneys for Plaintiff*
*CHG-Meridian USA Corp.*

QB\90108547.3